# UNITED STATES DISTRICT COURT
for the
District of Guam

FILED
DISTRICT COURT OF GUAM
SEP 23 2019
JEANNE G. QUINATA
CLERK OF COURT

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

Blue Dodge Ram Government of Guam Tag Number vehicle used by Jesse Mendiola Blas
(Further described in Attachment A)

Case No. MJ- 19-00069

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Blue Dodge Ram Government of Guam Tag Number vehicle used by Jesse Mendiola Blas. Further described in Attachment A.

located in the _____ District of _____Guam_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B which is incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841(a)(1) 843b & 846 | Distribution of Methamphetamine, Use of Communication Facility and Conspiracy |
| 18 USC 1956, 1341, 1951, & 1952 | Money Laundering, Mail/Wire Fraud, Extortion Under Color of Official Right, and Travel Act Bribery |

The application is based on these facts:

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

RAFAEL A. FERNANDEZ, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9/23/19

*Judge's signature*

City and state: Hagatna, Guam

JOAQUIN V.E. MANIBUSAN, JR., U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT OF SPECIAL AGENT RAFAEL A. FERNANDEZ

I, Rafael A. Fernandez, am a Special Agent, the United States Department of Justice, Federal Bureau of Investigation (FBI), being duly sworn, deposes and says:,

## INTRODUCTION AND AGENT BACKGROUND

1. I have been employed by the Federal Bureau of Investigation since March 2011. I am charged with the duties and responsibilities of investigating Public Corruption, as well as individuals and organizations that are engaged in narcotics trafficking in violation of Federal Laws including Title 21, United States Code, Sections 841, 843 and 846 (distribution and possession with intent to distribute, and conspiracy to distribute and possess with intent to distribute, controlled substances), Title 18, United States Code, Section 1956 (money laundering), Title 18, United States Code, Section 1341 (mail/wire fraud), and Title 18, United States Code, Sections 1951 and 1952 (Extortion Under Color of Official Right, Travel Act Bribery), hereafter, the "SUBJECT OFFENSES").

2. I have been involved with, conducted, and led numerous investigations that have resulted in indictments and convictions of individuals engaged in Title 18, Public Corruption Violations, as well as Narcotics Trafficking violations. I have received significant training on the techniques and methods used by such individuals and organizations that engage in the above violations, to include narcotics trafficking. Techniques and methods that are used, include but are not limited to, the use of landline and cellular telecommunications, including voice, text and internet/web applications, used in order to coordinate the distribution of narcotics. In addition, because of the nature of narcotics trafficking, individuals and organizations develop techniques and methods to avoid law enforcement detection. This may include soliciting assistance from Law Enforcement Officers who may be financially vulnerable and provide narcotics traffickers

1

with advance notice of Law Enforcement activities that assist those narcotics traffickers in avoiding Law Enforcement detection. In addition, individuals and organizations are likely to quickly relocate valuable narcotics

3. I have also been involved in, among other things, in the use of confidential human sources (CHS). I have directed and controlled numerous narcotics purchase operations, controlled CHS meetings to discuss pricing and logistics of narcotics distribution. Moreover, in the course of my investigations, I have conducted, led and participated on numerous search warrants for physical premises, as well as for electronic evidence and data, including the content and other data associated with email, electronic messenger services, financial, and storage devices on cellular and smart phones, as well as traditional Internet access machines, and digital storage machines including laptop computers, desktop computers, servers, routers, video surveillance equipment and other devices used to access the Internet.

4. This affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training, experience and advice received concerning narcotics sales and distribution in the United States Territory of Guam. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**PURPOSE OF AFFIDAVIT**

5. This affidavit is submitted in support of an application for a search warrant for the following:

2

Government of Guam issued Blue Dodge Ram Government of Guam Tag number 6676 vehicle used by JESSE MENDIOLA BLAS, hereafter referred to as **"TARGET VEHICLE."**

6. As set out further below, I submit that there is probable cause to believe that the search of the TARGET VEHICLE, will reveal evidence, fruits, and instrumentalities of violations of:

7. Title 21, United States Code, Sections 841, 843 and 846 (distribution and possession with intent to distribute, and conspiracy to distribute and possess with intent to distribute, controlled substances), Title 18, United States Code, Section 1956 (money laundering), Title 18, United States Code, Section 1341 (mail/wire fraud), and Title 18, United States Code, Sections 1951 and 1952 (Extortion Under Color of Official Right, Travel Act Bribery)(collectively, hereafter, the "SUBJECT OFFENSES").

## BACKGROUND OF THE INVESTIGATION

8. As a course of my investigation, consultation with the United States Postal Inspection Services (USPIS), Drug Enforcement Administration (DEA), the Department of Homeland Security (DHS) Homeland Security Investigations (HSI), Guam Customs and Quarantine Agency (GCQA), and Officers of the Guam Police Department (GPD), I have been advised that narcotics traffickers in Guam have established logistical routes including the use of the United States Postal system, hereafter referred to as the "mail."

9. The investigation into the use of the mail in order to traffic narcotics has resulted in various controlled deliveries, and identification of several target residences and individuals. The investigation has identified individuals who are engaged in narcotics trafficking activities and have enlisted the assistance of couriers who recover packages, and deliver packages to target residences.

10. The investigation revealed that narcotics trafficking organizations capitalize on the use of the postal system in order to traffic narcotics. The investigation resulted in federal cooperating defendant (FCD) identifying a large scale organization that uses the postal system in the trafficking and importation of pounds of Methamphetamine, hereafter referred to as "meth", into the United States Territory of Guam.

11. On March 15, 2018, an individual, who was then pending Territory of Guam narcotics trafficking charges, who ultimately became a FCD advised federal Agents that the narcotics trafficking organization known as the Agat Blood Town (ABT), is supplied by a high level trio organization known as WEEDEMBOYZ. The FCD knew activities of the group personally, and the FCD indicated that one member of the group had personally funded the Mayoral campaign of JESSE MENDIOLA BLAS (BLAS). The FCD provided Agents with telephone number 671-686-6255 that the FCD said was used by BLAS. BLAS has been the Mayor of the Village of Yona since 2017.

12. The FCD indicated that BLAS maintains relationships with narcotics traffickers, notably Lovelia MENDOZA (MENDOZA). The FCD indicated that MENDOZA was receiving packages of meth into cluster boxes controlled by BLAS. The FCD indicated that MENDOZA believed that BLAS may have taken two packages of meth that were in the mail system for MENDOZA. DEA arrested MENDOZA on April 17, 2017, and had been working as a cooperating defendant for the DEA. MENDOZA was convicted and sentenced on July 31, 2018 to eight years imprisonment. During the arrest, the FCD indicated that MENDOZA was dating BLAS.

13. While MENDOZA was awaiting sentencing, a CHS provided information that MENDOZA coordinated the importation and delivery of a mail package containing 456 grams of

4

meth. On May 10, 2018, a controlled delivery operation was executed by FBI and USPIS agents that resulted in the seizure of the 456 grams of meth. The controlled delivery operation revealed that MENDOZA was the intended recipient of the meth package. This delivery was not to the cluster boxes controlled by BLAS.

14. On May 22, 2018, Agents requested subscriber information and toll records for telephone number 671-686-6255 from Docomo Pacific dba Guam Wireless Telephone Company LLC. The results of this request was 671-686-6255 is subscribed to JESSE MENDIOLA BLAS, 265 Sister Mary Eucharita Drive, Yona, Guam 96915. The telephone toll records indicated that telephone number 671-686-6255 was in frequent contact with previously identified large scale narcotics traffickers in Guam.

## INTRODUCTION OF FBI CONFIDENTIAL HUMAN SOURCE

15. On October 3, 2018, a CHS reported that the CHS knows that BLAS has sticky fingers. The CHS reported that the CHS at the time was familiar with BLAS.

16. In order to further corroborate information provided previously by the CHS, as well as vetting information received via toll records, your affiant directed the CHS to conduct a meeting with BLAS in which the CHS told BLAS that the CHS wanted to get a mailbox in order to receive packages from a friend in the Continental United States. The CHS indicated that when the CHS requested a Yona mail box, BLAS told the CHS that he can help him/her obtain a mail box. The CHS told BLAS that he/she needed to make sure that the mail is secure because he/she wants to receive packages from a friend in the "states." BLAS told the CHS that packages would be secure, however, the CHS needed to "share" with BLAS.

17. On November 21, 2018, at affiant's direction, the CHS executed a recorded controlled telephone conversation with BLAS, to discuss the receipt of the mailbox. The initial

5

outgoing call was not answered and the call went into voicemail. The CHS then received an incoming call several minutes later from telephone number 671-686-6255. The CHS greets the caller as Mayor, and knows the caller to be Yona Mayor JESSE BLAS. The CHS told BLAS that the CHS is ready to meet and has money for the mailbox. BLAS asked the CHS as to how much money the CHS has. The CHS responds with $300. The CHS and BLAS agreed to meet later that day at the Buenas Market.

18. At affiant's direction, the CHS conducted a controlled audio and video recorded meeting. The CHS was provided with $300 in which the CHS was to use to pay Yona Mayor BLAS for the mailbox in Yona, as coordinated with BLAS.

19. At approximately 3:45 P.M., Special Agent Erwin Fejeran (HSI) noticed a blue official Yona pickup truck parked at the Mobil Gas Station in Yona. SA Fejeran indicated that the official blue pickup truck was operated by Yona Mayor JESSE BLAS with Government of Guam Tag number 6676. The official blue pickup truck pulled into the Buenas Market at approximately 3:51 P.M.

20. After walking to the Buenas Market, the CHS waited for several minutes at the market's parking lot. After several minutes, the CHS saw BLAS pull into the parking lot, driving a blue pickup truck with a Government seal. After the initial greeting, BLAS and the CHS walked into the Buenas Market and towards the back of the market where the sodas are merchandised. The CHS gave BLAS $300 for the mailbox. BLAS told the CHS to walk to his office and wait for BLAS. BLAS went to the Mayor's office and waited. BLAS later came into the office, he wrote information on a log, and appeared to have used his computer. In addition, BLAS gave the CHS the address for the mailbox is Cluster #20, 136 Jose Lela Doe, #2. BLAS gave the CHS 2 keys and also wrote the address on a piece of paper. BLAS walked outside and

6

showed the CHS the mailbox that BLAS assigned the CHS. At the conclusion of the meeting, the CHS told BLAS that the CHS would contact BLAS when the CHS received a package.

21.     On December 11, 2018, FBI and USPIS Agents conducted a consensual recorded phone call in order to meet with BLAS in person. The CHS told BLAS that the CHS wanted to meet with BLAS to provide him his share of a package received via the postal box previously provided by BLAS. CHS phone called BLAS and then met with him face-face at approximately 9:00AM in the Mayor of Yona office. The CHS brought up seeing BLAS and Joey TERLAJE previously and asked BLAS if the CHS was in trouble as TERLAJE is police. BLAS said don't worry about Joey, he is BLAS' pare. [Note: "Pare" is a local native word for "friend".] During the meeting the CHS told BLAS he/she received a package and handed it off to his/her point of contact. By delivering the package successfully, the CHS said he/she received $5,000 and was there to give BLAS his share. The CHS then handed BLAS $2,500 in cash which he accepted and counted behind his desk. CHS said "I should be getting another package next week or maybe after Christmas" but will let BLAS know. BLAS asked the CHS if he/she had his number to which the CHS replied "yes." As the CHS was leaving the office he/she turned around and told BLAS the $5,000 was for the ice [Note: according to various CHS's meth is referred to as ice in Guam.]

22.     On December 20, 2018, during a consensually recorded meeting the CHS met with BLAS in a break room within his office building. BLAS was already in the break room waiting for CHS and a radio was on somewhere in the office area. During the meeting the CHS said he/she passed $5,000 in cash to BLAS over the table and he took it using both hands to try and cover up the money and then placed it in his shoulder bag. BLAS then asked the CHS if he/she was working for the FBI or CIA to which the CHS said "I think you know who I am

7

working with" and BLAS said yeah I know who in Agat and other places. CHS expressed some concern over BLAS' key associate Joey TERLAJE, who is the Guam Department of Corrections Deputy Director, to which BLAS said don't worry about him it's okay. BLAS told the CHS he had already made $10,000 that day plus the $5,000 so he had made $15,000. BLAS told the CHS that he needed another $2,000 the following week. BLAS gave the CHS $100 before the CHS departed, the $100 was the CHS's share and was taken from the $5,000 the CHS had provided at the beginning of the meeting.

23. On January 3, 2019, your affiant directed the CHS to conduct a consensually monitored audio and video recorded meeting with BLAS. The CHS waited for BLAS to arrive, the CHS then noticed BLAS pull into the parking lot, driving a blue pickup truck with a Government of Guam, Yona seal. The vehicle had Government of Guam License Tag number 6676. The CHS walked up to the pickup truck and talked to BLAS as he sat in the driver seat. The CHS told BLAS that a package was coming this week or during the weekend. BLAS acknowledged and told the CHS to tell his/her "people" that if they want another mail-box that he can set it up. BLAS also told the CHS that the second mail box would be set up under a different name and different address. BLAS told the CHS that he was hoping that a package would have arrived prior to the new year because BLAS wanted money to buy things for his kids.

24. The CHS asked BLAS if he knew where the CHS would be able to purchase cocaine. BLAS told the CHS that cocaine is difficult to send via the mail because it can be detected. BLAS told the CHS that dogs can sniff the cocaine and easily detect it. BLAS said that cocaine is different than meth, because meth does not have an odor. BLAS told the CHS that as far as he knows, cocaine comes into Guam from Saipan via the water in a boat. BLAS said that cocaine is expensive. CHS told BLAS that if the incoming box is 5 pounds then the CHS would

8

receive $5,000 and if the incoming box is 10 pounds the CHS would receive $10,000. The CHS said that once he/she is paid by his/her "man", that as BLAS requested, the CHS would provide BLAS with the money so that the CHS and BLAS could split it. BLAS told the CHS that he is patient, and that BLAS knows how much money the CHS should get. BLAS acknowledged that the last time that the CHS paid him that BLAS only gave the CHS $100 in return and that this time it will be different.

25.    On January 12, 2019, your affiant directed the CHS to conduct an audio recorded meeting. The CHS walked to the cluster mailboxes at the Yona Mayor's office. The CHS recovered a package that was put into the mail by USPIS Agents. The CHS previously told BLAS that the CHS was due to receive a package of meth in the mail, in which the CHS would provide BLAS with money. After the CHS recovered the package, the CHS turned over the package to the Agents.

26.    Later that day, the CHS contacted BLAS and told BLAS that the CHS wanted to meet with BLAS to provide BLAS payment for the package that the CHS received in the mail. The CHS was once again, outfitted with an audio and video recording device and was sent into meet with BLAS. The CHS met with BLAS at the Yona Mayor's office, the CHS sat with BLAS at one of the desks in BLAS' office. The CHS asked BLAS if BLAS had another mailbox. BLAS told the CHS that BLAS has plenty of mailboxes available, but the cost for another mailbox would be $15,000. BLAS told the CHS that it would be better to make one lump sum payment of $15,000 so that BLAS and the CHS would not have to meet often. BLAS said that mailboxes go for $15,000 and that the CHS's people should not have a problem with the amount. The CHS gave BLAS the $4,000 in cash that the CHS told BLAS that the CHS received for the meth that

9

came in early that morning. BLAS took the cash from the CHS and counted the cash. BLAS did not give the CHS any cash in return.

27. BLAS told the CHS that during the past week, that 2 packages were taken by law enforcement before being delivered to Yona. BLAS said that they were taken, because the recipients of the packages are not using him or his cluster boxes. The CHS told BLAS that the CHS is receiving $6,000 from his/her people, and that his/her people want to buy cocaine. BLAS told the CHS that cocaine is expensive. The CHS told BLAS that the CHS wants cocaine because his/her people want to make crack. BLAS told the CHS that cocaine is shipped in from Saipan and that he can get the CHS cocaine. BLAS told the CHS that crack is also known as dirty cocaine. BLAS told the CHS that he will get in touch with someone and contact the CHS later that day to coordinate the cocaine purchase.

28. BLAS told CHS that BLAS will be traveling to Manila on January 17, 2019, for surgery and that BLAS wants money before he travels. BLAS told the CHS that he has plenty of empty boxes and that BLAS is the only one that can get the CHS mailboxes. BLAS told the CHS that he can make sure that packages go undetected because BLAS can switch names and addresses. BLAS told the CHS not to talk to anyone about the mailboxes because BLAS is the only one who controls the mailboxes and keys. The CHS indicated that the CHS received that handwritten paper from BLAS with the amount that he wanted for the other box and also with the date that BLAS would be traveling to Manilla.

29. On January 15, 2019, affiant directed the CHS to conduct a consensually monitored phone call into 671-686-6255 in order to meet with BLAS. The CHS waited for BLAS, and after several minutes, noticed that BLAS pulled into the parking lot again, driving the Government of Guam Yona Official Truck with license tag 6676. The CHS walked to the

10

driver's side window to talk with BLAS. The CHS told BLAS that the CHS had good news. The CHS said that the people agreed to pay BLAS $15,000 for the second mailbox. BLAS told the CHS that he will make sure that for each shipment of meth, BLAS will provide the CHS with a different key for a different mailbox. BLAS told the CHS that he will give the CHS a name and a different mailbox when the CHS is ready for a package. BLAS told the CHS that BLAS will then give the CHS a key to the mailbox, and that once the package was received that the CHS would return that key back to BLAS. BLAS would then give the CHS another address and a different name for the next package, and continue to switch mailboxes to avoid detection by the post office. BLAS told the CHS that he is the only one in the Mayor's office that controls the mailboxes and keys. BLAS reminded the CHS not to talk to any employees in his office about the mailboxes or keys. BLAS told the CHS that switching mailboxes works, because the post office can check to see who the recipient of the packages are, and eventually detect packages.

30. On January 17, 2019, the CHS asked BLAS if he was ready to sell the CHS two ounces of cocaine. BLAS told the CHS that his people were ready the other night, but that the CHS was not ready. The CHS told BLAS that the CHS will be ready the next day and can buy 2 ounces in order to test the quality of the cocaine. BLAS told the CHS that he would be willing to sell that night and will let the CHS know if cocaine is available. BLAS told the CHS that he did not know if his people still had cocaine because it goes fast. BLAS told the CHS cocaine comes from Saipan and asked the CHS if the CHS has someone in Saipan that can obtain cocaine and send it to Guam. The CHS told BLAS that the CHS is available to travel to Saipan. BLAS told the CHS that he can help the CHS obtain cocaine in Guam or Saipan.

31. BLAS contacted the CHS via telephone from telephone number 671-686-6255, and told the CHS that he would be late because he was in Talafofo. During the call, BLAS told

11

the CHS that he wanted the CHS to travel to another location to meet him. The CHS told BLAS that the CHS was already dropped off and was waiting for BLAS. BLAS arrived and told the CHS that he had a flight at 10:50AM. BLAS told the CHS that he is getting an operation on Saturday and that he would be returning to Guam the following week. BLAS told the CHS that his guy did not have cocaine, but that there is a guy in the Philippines that will help him. BLAS told the CHS that when he returns from the Philippines that he will be able to sell cocaine to the CHS. The CHS told BLAS that his/her people want cocaine because it is good. BLAS acknowledged and told the CHS that if the CHS wants, that the CHS can try to meet at Yona in order to obtain the cocaine.

32. BLAS told the CHS that the CHS should give BLAS money, however, the CHS told BLAS that the CHS is not allowed to let money go. CHS wanted to exchange product for money at the same time. BLAS told the CHS that he will be in touch when he returns from the Philippines. The CHS also told BLAS that the CHS will obtain money for the additional mailbox that was previously offered by BLAS.

33. On March 21, 2019, your affiant directed the CHS to initiate a consensual monitored telephone conversation to BLAS via the WhatsApp application installed on the CHS's cellular telephone, to WhatsApp account 671-686-6255. The CHS indicated that BLAS had previously contacted the CHS via WhatsApp when BLAS had traveled to the Philippines.

34. In addition, the CHS provided Agents with a WhatsApp text message conversation, where CHS tells BLAS that the CHS is trying to get more money for BLAS, however, the CHS needs to keep cluster box open. BLAS tells the CHS via WhatsApp message that BLAS needs money "now" in order to keep the CHS's cluster box open.

12

35. After placing the WhatsApp voice call, the CHS and BLAS meet. The CHS tells BLAS that the CHS is trying to get money today. BLAS tells the CHS to let "them" know that if BLAS does not receive money today that the "box" will be closed tomorrow. The CHS tells BLAS that the CHS has paid BLAS $10,000 and that the CHS wants to keep the mailbox open. BLAS tells the CHS that, he and the CHS had an agreement, and that BLAS needs money in order to pay his medical expenses. BLAS said that he wants $8,000 "tonight" so that he can keep the box open. BLAS told the CHS to tell his/her people not to send anything to the box because it will be closed. BLAS told the CHS to call him when the CHS has the money.

36. On June 19, 2019, affiant directs the CHS to conduct an audio and video recorded meeting. Affiant directs the CHS, who had previously talked to BLAS about help with a family member of the CHS's that was in the Guam Department of Corrections. The CHS walked into BLAS' office and BLAS told the CHS that BLAS thought that the CHS was off island. The CHS told BLAS that the CHS is due to receive an incoming package of meth sometime soon, and that the CHS will provide BLAS with money. CHS told BLAS that the CHS has a cousin that is confined at the Department of Corrections in Mangilao, Guam. The CHS told BLAS that the CHS's family is willing to pay $15,000 so that the cousin can be released from jail for a few days.

37. BLAS told the CHS that "JOEY" will help. BLAS told the CHS that there will be 4 people that need to be paid, in order to help the CHS with releasing the CHS's cousin from jail for a few days.

38. The CHS told BLAS that the CHS's family is putting together a lot of money so that family members have the opportunity to see the cousin who has been in jail for several years. There is a family member from Hawaii that will be traveling to Guam and wants to spend a few days with the CHS's cousin. The CHS told BLAS that the cousin received a 25 year sentence, and

13

was involved in an incident that caused the death of a police officer. BLAS told the CHS that BLAS is familiar with "that" case and that BLAS can help the CHS. BLAS asked the CHS to write down the name of CHS's cousin. The CHS told BLAS that the cousin is "JAIEME ISAWA" (ISAWA). The CHS told BLAS that the family would like to see ISAWA for 2 or 3 days. BLAS and the CHS agreed to talk later.

## STATEMENT OF PROBABLE CAUSE

39. Based on information provided, I seek a search warrant for a Government of Guam issued blue Dodge Ram Government of Guam Tag number 6676 vehicle used by JESSE MENDIOLA BLAS.

40. I seek search warrant for the above, because based on the foregoing information and my training and experience, I have good cause to believe that Government vehicle operated by BLAS may contain evidence of the captioned SUBJECT OFFENSES. Based on the aforementioned, probable cause exist that the BLAs used his office, and his official position in order to document and provide mailbox keys to narcotics traffickers. In addition, the BLAS used his Government issued vehicle to conduct narcotics transactions as well as receive bribe payments.

41. Based on the foregoing, I respectfully request the court to issue a warrant to seize the items and information specified in Attachment(s) B to this affidavit and to the Search and Seizure Warrant(s).

## SEALING REQUEST

42. It is respectfully requested that the Court issue an order sealing, until further order of the Court, all papers submitted in support of the requested search and seizure warrant(s), including the application(s), this affidavit, the attachments, and the requested search warrant. I

14

believe that sealing these documents is necessary because the information to be seized is relevant to an ongoing investigation and includes references to cooperating individuals. Premature disclosure of the contents of the application, this affidavit, the attachments, and the requested search warrant may adversely affect the integrity of the investigation, including giving targets a chance to destroy evidence or take other steps to hinder the investigation.

FURTHER AFFIANT SAYETH NAUGHT.

_____
RAFAEL A. FERNANDEZ
Special Agent
Federal Bureau of Investigation

# ATTACHMENT A

## Property to Be Searched

Search Warrant for a Government of Guam issued Blue Dodge Ram Government of Guam Tag number 6676 vehicle used by JESSE MENDIOLA BLAS.

1

Case 1:19-mj-00069   Document 1   Filed 09/23/19   Page 17 of 20

ATTACHMENT B

1. The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 21, United States Code, Sections 841, 843 and 846 (distribution and possession with intent to distribute, and conspiracy to distribute and possess with intent to distribute, controlled substances), Title 18, United States Code, Section 1956 (money laundering), Title 18, United States Code, Section 1341 (mail/wire fraud), and Title 18, United States Code, Sections 1951 and 1952 (Extortion Under Color of Official Right, Travel Act Bribery), hereafter, the "SUBJECT OFFENSES")

   a. Controlled substances, in particular methamphetamine, cocaine, and ice, and the items commonly associated with the packaging and sales of controlled substances, including commercial plastic wrap, plastic bags or zip lock bags.

   b. Records, correspondence, narcotic customers lists, narcotic suppliers lists, ledgers, logs, journals, accounts payable and receivable, pay-owe sheets, contracts, letters and memoranda of agreements between potential coconspirators, formulas, receipts, phone records, phone books, address books, notations and other papers, and any files relating to the transporting, ordering, purchasing, or distributing of controlled substances.

   c. ~~Photographs and/or video, in particular photographs and/or videotapes of potential co-conspirators and their criminal associates, assets, and/or controlled substances, along with personal address lists, and other documents with the names and telephone numbers of potential co-conspirators.~~ [initialed]

   d. Records relating to the use of and accumulation of proceeds derived from the commission of the SUBJECT OFFENSES, as well as the acquisition of property obtained from proceeds, and items evidencing the obtaining, secreting, transfer, concealment, and/or expenditure of money obtained from the commission of the SUBJECT OFFENSES, including records of large purchases, receipts, canceled checks, bank records, credit card records, wire transfers, wire transfer receipts, cashier's checks, cashier's check receipts, addressed mail, express delivery receipts/envelopes, utility company receipts, rent receipts, income tax returns, money drafts, money orders, and their receipts.

   e. Financial records including expenses incurred in obtaining the equipment and items necessary for the transportation and/or distribution of controlled substances, income derived from the sales of controlled substances, as well as records of legitimate income or lack thereof, and general living expenses.

   f. United States currency in excess of $200, gift cards, cash cards, and records relating to income derived from the commission of the SUBJECT OFFENSES and expenditures of money and wealth, for example, money orders, wire transfers, cashier's checks and receipts,

2

passbooks, checkbooks, check registers, securities, precious metals, jewelry, antique or modern automobiles, bank statements and other financial instruments, including stocks or bonds in amounts indicative of the proceeds of illicit controlled substances trafficking and/or money laundering or public corruption.

g. Documents indicating travel in interstate and foreign commerce, such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills.

h. Receipts, notes, ledgers, records, programs, and applications relating to Bitcoin and other cryptocurrencies.

i. Records reflecting names, addresses, telephone numbers, internet monikers, and other contact or identification data for others involved in the exchange of bitcoin and other cryptocurrencies.

j. Any digital device used to facilitate the above listed violations and forensic copies thereof.

k. With respect to any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

    i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

    ii. evidence of the times the device was used;

    iii. passwords, encryption keys, PGP keys, recovery seeds, and other access devices that may be necessary to access the device;

    iv. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

    v. records of or information about Internet Protocol addresses used by the device;

    vi. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or

3

"favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.